Basic History of Franklin, Massachusetts Good morning, please be seated. We're happy to hear argument in our first case number 134133 United States versus Eggleston. Mr. Martin. Please the court, counsel, those in attendance. My name is Anthony Martin and I represent Xavier Eggleston. What I intend to do, Your Honor, is give you a brief background of the facts. I'm going to go into a chronology and I'm going to go into the first issue and that is dealing with the cell phone search and seizure and then from there I'll move to the other issues of multiplicity, variance, etc. Philip Whitehurst ran an extensive drug organization in Kentland, Maryland. This is a suburb of Washington DC and he did that for some time and he had quite a bit of resources in the way of running this operation. He had a stash house that ran 24-7. He had personnel, including stash house captains, so that the operation could stay open 24 hours a day. He had drivers, distributors, sellers, cooks, collection agents, and lookouts. And of course he had customers. And what all of these people had in common was the Kentland neighborhood. The customers came there to buy crack. The personnel was there to deal in crack. Everybody was there to sell. Some of the customers, however, also bought powder. But all of those customers also came from Kentland. Either they had family in Kentland, they used to live in Kentland, or they had paramours who lived in Kentland. The only customer who had nothing to do with Kentland was Xavier Eccleston. And the only customer who had nothing to do with a crack operation was Xavier Eccleston. Now Mr. Eccleston was a detective. At the time of his arrest, his personal effects were taken from him. He had a backpack, he had some boxing gloves in the backpack, and what have you. And he had a cell phone. And that cell phone was searched that same day by a detective from the Montgomery County Police Department, who was a member of the task force. And his name was Robert Grimms. And what he did was he turned on that cell phone and he went mining through it. He went fishing through it. And what did he find? He found a photograph, which had extreme importance, which I'm going to explain in just a moment. And he also had the telephone number of different peoples that appeared. One of those was a gentleman by the name of Gavin Wallace. And Gavin Wallace was presented as a witness by the government and he was the only witness they presented as a customer for Xavier Eccleston. And Gavin Wallace, like Xavier Eccleston, had something in common. He too had nothing to do with Kentland. And the two of them were both of European descent. Everybody else involved in this, not that it should matter, was of African ancestry. Can I ask you something? Yes. How long was the trial in this case? I believe the trial lasted four days, maybe five. Jury trial, right? It was a jury trial. And did you represent? I was the trial defense counsel. And you're doing a fine job here. You made those arguments there, right? That's correct, Your Honor. Okay. All right. Well, then moving on, let's get straight to the issue of the cell phone. There was no warrant. It's okay to seize it. And the issue was raised at trial as to whether or not the information that was taken from the phone should be admissible. And I argued that it should not be admissible because the government did not have a warrant at the time of the search. It was incident to an arrest? No. The seizure was incident to an arrest. The search, the government argued, was incident to an arrest. And I believe that they cited Murphy. The problem with citing Murphy, which the trial judge relied on, is that Murphy consented to the search of his phone by explaining to the officer how to use it, how to turn it on, and how to mine it for information, for data. Mr. Eccleston never did that. In fact, Mr. Eccleston's phone was not properly searched until 10 months later. Why do I say that? On the 25th of July, 2012, we had a motions hearing. The government applied for a warrant to search the cell phone's information on the 18th of July, 2012. On the 23rd of July, they actually went into the phone, pursuant to the warrant that was granted, and they returned on the warrant the 30th. So the defense never had an opportunity to contest the seizure or the information. In fact, we didn't even know about the search warrant until two days into the trial. The trial started September 11th, 2012, and it wasn't until September 13th, 2012, that we became aware of the search warrant and the evidence that was taken from it. So not only was the defense taken by surprise, there was a violation of the Fourth Amendment. And I don't believe that that's an issue anymore, because the Supreme Court has now ruled on that issue in Riley v. California and in U.S. v. Worry. Have you read United States v. Stephen? I can't say that I have, Your Honor. Well, it's a Fourth Circuit case saying that we are not going to apply Davis retroactively. We're not going to apply Stephens retroactively. You're not going to apply Stephens retroactively? Indeed. Well, even if you're not applying it retroactively, that still doesn't get around the problem of the... Well, prior to Stephens, under our precedent in Stephens, in my case is mixed up, in Stephens, we read our earlier precedent as provable. Your earlier precedent? I'm just telling you that we don't apply the Supreme Court rule. It's held to Stephens a couple of months old now. There's a dissent, but that's the circuit law. Well, Your Honor, there's a Fourth Amendment violation, and with all due respect, I understand. I mean, you can re-argue it. No, I'm not going to re-argue it. I'm not even suggesting to you that I necessarily think it's right. I'm just telling you it exists. I wasn't aware of that, and so I guess that that's something that will have to be taken up later if necessary. Well, then, moving on to the next issue. There was a vote about whether to take it on bank, which failed. Thank you for the heads up, Your Honor. I know where I stand with respect to that, but still, there may be other remedies available to Mr. Eccleston, notwithstanding that. With respect to the multiple conspiracy and the variance argument, getting back to the cell phone, it still becomes important, because up to that point, all the evidence had shown was that Mr. Eccleston was involved in powder. He had nothing to do with crack. And the indictment read that there was a conspiracy to possess and distribute both powder and crack. All the evidence that came in showed that Mr. Eccleston had nothing to do with crack. Notwithstanding that, I asked the judge for an instruction on multiple conspiracy, and he denied it. And I believe that that denial extremely hampered the defense in putting forward their case to the jury that Mr. Eccleston was part and parcel of a separate conspiracy, one only with Philip Whitehurst. Using the hub and spoke analysis, I said if Phil Whitehurst is the hub who's dealing with powder and he's dealing with crack, there is no rim. There is no organization that joins all of those various spokes that is an enterprise that Mr. Eccleston is part of. Was it not foreseeable to know about that? Well, if he was involved with him, and he was such a big crack dealer, how could he I mean, it certainly is foreseeable that he knows that. Well, Your Honor, I respectfully disagree with where you're going with that. If Mr. Eccleston was a supplier of the Kentland Drug Operation and they were dealing in crack, I would say that your question and your position is a valid one. But because Mr. Eccleston was a customer and he only bought powder, how could Mr. Eccleston possibly be responsible for what Mr. Philip Whitehurst is doing with his crack dealers and distributors? Well, he was buying enough to distribute. He was buying distributable amounts of powder. He had a relationship with him, so to me it seems foreseeable that he would know about the whole conspiracy, including the crack. Well, that's true, Your Honor, but mere knowledge or acquiescence or even presence isn't enough to find somebody in a conspiracy, and I think that that's settled. So I would submit to the court that that fact alone doesn't put Mr. Eccleston in the Kentland Drug Operation. There has to be more than that. Well, you can see that he engaged in some illegal activity with Mr. Eccleston, and you're saying that knowledge of Mr. Eccleston engaging in other illegal, I mean of Mr. Eccleston's knowledge of the big guys engaging in selling other drugs doesn't do it. We're saying he's part of the total conspiracy. That's correct. I'm not so sure. What authority do you have for that? When you've conceded that Jorkman did engage in one illegal conspiracy with him involving out of the same house, blah, blah, blah, I don't reckon that there's – it seems to me a conspiracy law goes perhaps further than one might like, but it's pretty broad. Well, that's true. The conspiracy law is broad. It's the darling of the prosecution, but it still doesn't get around the fact that just because somebody is aware of the nefarious acts or the misconduct of another person, that they're necessarily involved in it. And I would submit to the court that on these facts anyway, on these particular facts, that's not enough to show that Mr. Eccleston was part of the Phil Whitehurst conspiracy. In any event, the jurors should have been able to decide that, and when we asked the judge for the multiple conspiracy instruction, he failed to give it, despite the fact that  And I think that that went to affecting Mr. Eccleston's substantial right in that he didn't get to present the defense that he was entitled to. The indictment read that he was responsible for conspiring to distribute both cocaine and crack. That is essentially our argument on the variance, Your Honor, and on the constructive amendment. I will now turn to that particular argument. There came a point in the jury deliberations where the jurors sent back a note, and they were pretty astute, as these jurors always are. And they said, we note that the verdict sheet in the indictment says that in order to find him guilty, or do we have to find him guilty of both powder and crack? And the judge responded, over objection, that you can find him guilty of conspiring to And we believe that by doing that, what he did was he broadened the scope of Mr. Eccleston's potential liability, and he also impermissibly amended the indictment and violated his Fifth Amendment right to have an indictment by the grand jury. And that constructive amendment argument was, I don't want to say was ignored by the court, but he did not agree with us. He went forward anyway, and it was shortly after that. And when I say shortly, within hours after that, that Mr. Eccleston was found guilty. Now, the government says that we are speculating as to whether or not the jurors would have acquitted him. Perhaps there is some speculation, but I suggest that the note says that reasonable people were having a hard time finding him responsible or guilty of being involved with crack. And that's the point that we made in our briefing. You did determine that attributed amount of both crack and powder cocaine to your client, correct? That's true. They did. They did. The other issues raised, Your Honor, also go to the question of, well, not sentencing. I'm not going to argue that. We're going to submit on the record regarding that. And I'm not going to argue about the 404B either. But Mr. Eccleston was also concerned with the fact that his speedy trial rights were violated. If you read the brief, you'll see that he had made several demands for a speedy trial. And one of the arguments that was put forward by the government as to why this case couldn't go forward within 70 days was that it was a complex case. And as we look at it now, there were, what, five defendants? It looked like a simple street operation. The government also pointed to the fact that there were two phantom fugitives that had been indicted or two indicted individuals who weren't caught yet. They were out there somewhere. And nobody was ever joined to the indictment afterwards. So we, you know, and by the way, let me say that there were two government trial counsels on the case. Aside from Mr. David Salem, there was another gentleman who's no longer with the Office of the United States Attorney who was on it. And I'm not suggesting that Mr. Salem did anything wrong. I am suggesting, though, that there were two people. And part of Mr. Eccleston's argument with respect to the speedy trial violation is that there was no due diligence on the part of the government or that it's his feeling that if this was a subterfuge, just to deny him his speedy trial rights. So that argument, I think, has been fully briefed. And we would ask the court to pay particular attention to that, too. With respect to the Title III, I'm not going to argue that point again. I think it's been sufficiently briefed. So why would we even mention that or the 404B or any of these other things? Because if you look at the entire circumstance, what it appears is that there were so many missteps, not only in the investigation but also in the trial, that Mr. Eccleston's right to a fair trial under the Sixth Amendment has been denied. And that's why he's asked me to bring this case before this court so that he, at the very least, could get a new trial. And it is our hope that after reading all the briefs and hearing the arguments, that you will agree that his sentence, his conviction, should be vacated. I note that I have about 24 seconds, and I would ask to keep that in reserve for rebuttal. Thank you. Thank you, Mr. Martin. Good morning, Your Honors. Mr. Salem, do you know about the United States v. Stevens? I do not, Your Honor. I'm sorry to say I do not. Well, it's not exactly the same issue, so I was going to try to make the argument for the other side distinguishing it. Since nobody knows about it, we'll just pass on it. I'm not aware of it, and I'm sorry to say. That's all right. We don't need any 28-J letters on it. We know about it. Okay. Because I know that your office is enthusiastic about those 28-J letters. And that is true, too. So let me just say, obviously, I've worked with Mr. Martin for a very long time and have the utmost respect for him. And by and large, he has adequately addressed, in generic terms, the facts of the case, save for one probably very important item, which is that we had several cooperators who testified. We certainly had information on Mr. Whitehurst during the course of the case. But factually speaking, what we did not do is prove that every one of the 20 or so individuals charged in the complaint were only from the Kentlands area or bought crack or powder and sold only in the Kentlands area. There's certainly limited information. That limited information does, in fact, show that most of these individuals shopped for the crack cocaine or the powder cocaine in Kentlands, and that it certainly was sold from the Kentlands area. But where exactly it went after that, there is no evidence. And it's unfair, I think, to say that everything happened. Shopping at a store makes you a conspirator with the owner of the store? Depending on what you know the owner is doing. Tell me about Mr. Eggleston, then. All right. Tell me what's the evidence beyond shopping at the store. Okay. Well, in this particular case, Your Honor, what happened is that Phil Whitehurst, who was the leader of this organization— I understand that, but we don't go into the facts. Let's just talk about Eggleston because the government puts all these people together. Bruton doesn't exist anymore. It used to be a thing called Bruton, and now it doesn't exist. But you put all these people together, and you say conspiracy. The question is, I want you to address directly Mr. Martin's question. That is, he said, yes, my client purchased powder as a customer. Now, I don't care what Whitehurst was doing. He may have had the biggest store in the world. He said, I bought powder from him. I bought powder, and I left. Whatever. Tell me factually, why is that wrong? That's all I'm going to tell you. Because that's the guts of this case, right? I think that that's right. I think the fact that he bought powder from Philip Whitehurst was selling powder and crack. Then he's a conspirator? That's a sale, isn't it? Well, no. I mean, he bought powder, and there was evidence that he distributed that powder. Okay. That's a conspiracy between just the two of them. But there was evidence that other people bought powder and distributed powder from the same individual, from the same houses. And there was evidence, certainly, that individuals also purchased crack from those houses, from the same houses, from the same individual. Good. Is there any evidence that Mr. Eccleston knew that other people were buying from Whitehurst? Well, there is evidence in the case. Ask that question. Is there evidence? Okay. What was that evidence? There is evidence in the case. What was the evidence? Co-operator Chris Rainey, when he testified, indicated that what happened was Eccleston would come to the house, one of the stash houses, and one of the things he would do is he'd purchase his powder cocaine, and then he'd sit around, and while he was sitting around, they would smoke marijuana, they'd watch television, ball games, whatever, and the crack purchasers were coming to the house at the same time and purchasing from the same individuals who were selling in that house and assisting Mr. Eccleston in buying his powder. So that, for example, there were calls where Whitehurst would tell Eccleston, go through and see John, this is John Holt, and you can pick up the powder. Essentially, that's the thrust of the conversation. And then John would call Whitehurst back and say that X came through and got the powder. So in many instances, when Eccleston's at the house, these individuals, including John Holt, are selling to others and selling crack cocaine at the same time. In addition, Rainey testified that most of the people he knew were buying powder and cooking it into crack and then selling it as crack, and that is at least some evidence that Mr. Eccleston was also involved in the crack cocaine. And the jury, after all, found him involved in a larger amount of powder and some crack cocaine. But it's not just a sale. I think that he was there when others were purchasing the crack. He clearly knew about it, and he clearly was aware of Whitehurst selling both cocaine and crack cocaine, which was why this was charged as a conspiracy for both drugs. And at least there's some testimony through Rainey that he may very well have been involved in crack cocaine himself. We didn't offer any other evidence, any stronger evidence, but there's enough there for the jury to have found what they did. Beyond a reasonable doubt. Beyond a reasonable doubt. He was involved in crack. Correct, Your Honor, beyond a reasonable doubt. And in any event, it wasn't the thrust of either the sentence or, in the end, obviously the guilty verdict relied on the large amount of powder cocaine, and he was sentenced on the powder cocaine, effectively, even though the judge included the, I think, up to 28 grams of crack cocaine. It did not affect the base offense level for the powder, and so ultimately he was sentenced on the powder alone. So in any event, in this case, there was evidence, obviously, that it went somewhat beyond the Kentlands area, at least no proof that everything was in the Kentlands area, and there certainly was evidence that Mr. Eccleston himself knew about, was aware of, and inactively participated in the sale of crack cocaine. You agree, but you agree that, hypothetically, anyone who went to the Whitehurst home or stash house, whatever you want to call it, to buy drugs, went in, bought the powder, and on their way out somebody else was coming through, and it was Bill, and said, Hey, Bill, how you doing? Fine, I just bought some crack from, oh, powder cocaine from Whitehurst. Yeah, I'm going to buy some, too, and you leave. So you're a conspirator with everybody, right? You're in a conspiracy, right? You're in a conspiracy with everybody, yes. Just because you knew somebody else was a customer. Well, you knew that crack cocaine was being sold by the conspiracy, and you're one of the actors in the conspiracy. Well, then everybody who buys cocaine is a conspirator of every conspiracy that the person they purchased it from. Everyone. Is that the theory of the government? No. My goodness, you could really open up jails then. No, no, that's not the theory of the government. The theory of the government is there was additional evidence that Mr. Eccleston was also involved with crack cocaine, including the fact that Rainey testified that typically people were selling powder cocaine, buying large quantities of powder cocaine, cooking it into crack, and selling it. We didn't put that evidence on, but some of it was there, and we did put a powder cocaine customer on. But even that, in that sense, was really used for a different purpose, which is largely to show that he distributed and didn't have the powder cocaine just for personal use. How long did the government investigate this? I think I was not on from the very beginning. I think the wiretaps began in the summer of 2010, and obviously the trial went forward in the fall of 2012, I believe. Two years before. Yes. But the government is the one who instigated this speedy trial, asking for an extension first. Correct? That's correct. I filed the motion on November 2nd. You had two years to investigate all of this, out of the largesse of your heart, of course, because you want an extension. Shouldn't it be the defendant that would be saying, I want it, why would you? You already have your investigation. You've got your files ready. Why did you come and say, I want an extension of time? You had your 10,000 pages of records, telephone calls, and article taps, three taps. Well, I didn't ask for an extension of time on behalf of the prosecution. I had suggested in the motion, as well as the order that Judge Williams signed, that the case was sufficiently complex because of, at the very least, the number of wiretaps and, at that time, even the number of defendants, that defense counsel would require additional time to be ready. And, of course, that motion was out there for approximately three weeks. There was no response from any of the defense counsel, none at all, and the judge signed the order. And then, ultimately, there were motions filed by various defendants about a month later, all the way through the motions hearing. We have motions in January and April and even in June and maybe early July, prior to the motions hearing in July. But didn't you have two defendants that weren't served, they were still at large? Well, Your Honor, that's probably a mistake on my part. Yeah, right. I was wondering about that. Tell me about that. Well, the complaint obviously charged about 19 or 20 people, and at the time of the superseding indictment, the first indictment, subsequent to the complaint, there was nobody redacted from that indictment, although there were a few people in the complaint who had been redacted who were still at large. Ultimately, we added some people along the way during this, I think the third superseding indictment in April added John Holt, for example, and he was at large at the time. But the charging document under which Mr. Eccleston went forward with his arraignment and then ultimately the motions were filed on there, there isn't a redacted fugitive. So that's probably my mistake on that. But nevertheless, that's not even a factor on the 3161H. What is a factor is the complexity of the case, and, of course, that was also in the order that Judge Williams signed. Does that make the case complex or just large? There's a difference between complexity and just large. It's just a lot of records to go through. I mean, it's not complex. You basically listen on someone's telephone conversations, and then you come up with, I love it, it's always the government has a lexicon. They know when someone says, we'll be going to bed tonight. Oh, when they said bed, they really mean we're going to get cocaine. I think you should publish that sometime so that all of us know before so that we can make our own. We can pull ours out so we can read along with you. Well, look, I think Judge Williams saw the evidence and he realized there were numerous search warrants. There were recorded conversations, undercover buys. There were confidential informants. There were wiretaps on several different phones that went for several months. There were a total of somewhere between 10,000 and 13,000 calls that were ultimately intercepted. So it's a large case for sure, but that also means there's some complexity to it. Who is dealing with whom? Are these people in the conspiracy or not? And you've got to really review all the evidence, what was found during the search warrants, what was found during the arrests, what, if anything, was on the phone calls, who was linked to whom. So there's complexity to it. And, look, Judge Williams was presented with the argument that this was a simple street crime, and he rejected that. And under the circumstances of the facts of the case, I think rightly so. He had the opportunity to see this as just a simple case, and he saw the conversations and the search warrants and the individuals who were charged and the fact that the government was adding people, finding cooperators among the original people that were in the complaint, and ultimately he found it complex. And I don't want to stand here and say it's the most complex case that's ever been charged by the U.S. Attorney's Office. It's certainly a complex case. So unless there are other questions, I move to the cell phone issue at this point. And obviously from the government's standpoint, everything was done properly. Under the law at the time, which we cited as Murphy, this detective who was involved in the arrest and had seized the telephone from Mr. Eccleston, I believe there may have been two phones but only one that was relevant, he searched an incident to lawful arrest. I realize it was a couple hours later that he actually did the search, which Judge Williams found under the circumstances, among which was the travel that Detective Grimms had to do once he made the arrest and then deposited the phone in another county and then had to look it up after processing the defendant, that that was a reasonable amount of time within which the- Well, why shouldn't we apply the Supreme Court when the Supreme Court has ultimately concluded on this issue? In terms of Worry and Riley? Well, I think ultimately that's what you should apply. Whatever Stephen says in this case. But ultimately we believe that assuming Riley and Worry are the law now, ultimately we got the search warrant. And of course one of the things that I think is in a little footnote that the government dropped there on the Second Circuit case is why we held onto the phone for as long as we did. And of course the phone has independent value as evidence. In a case involving wiretaps, the fact that Mr. Eccleston had a phone at all would have made it evidence for the trial. And of course the government was justified in holding onto the telephone for as long as it did. And it obtained a search warrant prior to the motions hearing and ultimately searched the phone, found items that were of use at trial, including a picture, I think, of the defendant with the main co-conspirator and then some contact list information and the name of this Mr. Wallace who was one of the defendant's customers. The search warrant, unfortunately I had this issue that had come up in June. I had been in a bike accident and so not clear exactly when the search warrant was provided to Mr. Martin, quite honestly. But in any event, it was the subject of a hearing in front of Judge Williams in which Judge Williams specifically asked Mr. Martin if there was a basis to suppress the search warrant, and Mr. Martin said no at the time. And I believe he said something like, this is the way it should have been in the first place. So, I mean, for all intents and purposes, that may very well be a waiver of this argument. But in any event, we got a search warrant in a timely fashion to open the contents of the cell phone. And what we saw there and what we introduced at trial is really cumulative of what we had anyway, and therefore harmless error in large part because three of the contacts on the list, it was Marshall Wood, I think it's Kenny Smith who was nicknamed Wood, and Mr. Bryant who was known as Lowe's, their contact information was on the phone, and they testified in the case. There was the picture of Philip Whitehurst, but those cooperators put Mr. Eccleston together with Mr. Whitehurst in their testimony. And ultimately when Mr. Wallace was called, as I say, he was called largely to offset strategically the thought that somehow you can buy such a large quantity of powder and then have it for personal use over time. And so he indicated that he had bought some from Mr. Eccleston so that we hope knocked that argument down. Apparently the jury agreed. But ultimately, even if for some reason or other we obtained the information in a constitutionally infirm way, it was, I believe, nothing more than harmless error. And then turning briefly to the... So your claim is that you got the cell phone information incident to a warrant. Is that what you're saying? That's correct. A later obtained warrant after you had the cell phone. That's correct. And when Detective Grimm searched through the cell phone himself, he did find the same information. I don't know if it came out in trial that the information was passed on to the FBI which obtained the warrant later. But ultimately the application for the warrant and the affidavit that went with it was based entirely on the wiretap calls and the probable cause did not concern in one iota any of the information that Grimm's may have passed on to the FBI agent. So when it was signed, it was signed on an independent source basis. Is there any contrary evidence, Your Honor? I don't think so, Your Honor. I don't believe so. And then just to get to the multiple conspiracies, and again it's sort of very fact specific, but ultimately you have a defendant who purchased powder like other people purchase powder. He went to the stash houses that were in question. He used some of the same individuals who were running the operation from those stash houses. And to the government's mind, there's the Crockett case way back maybe 30 years ago that we cited from the circuit that ultimately said an overlap of key actors,  clearly you don't have Eccleston involved as much as you may have Whitehurst involved or as much as you may have had Holt or Bryant or Rainey who were selling everything and passing the powder and the crack cocaine on to people like Eccleston and others. But that doesn't matter because somebody can have a lesser role and be involved in activities that from his perspective doesn't include knowledge of the activities of everybody else and he'd still be within a conspiracy. Where would you ever get the multiple conspiracy instruction do you think? Because I see no limitation at all in the way the government prosecutes these cases. Where would you get it? Can you give me just think of a scenario where you'll be appropriate to give the instruction because I can't tell the way you said you buy something and that person is selling and you know they're selling, you're a conspirator with that whole thing. I mean, look, it's hard to come to an example right off the top of my head. I know, it's that bad. We've gotten that so far from the Sixth Amendment rights in terms of notice and trial. I'm glad you answered that very candidly. I can't even fathom in the atmosphere a scenario. Well, let me suggest something. If I had, for example, a defendant who had, there was very little evidence of actually purchasing cocaine or crack cocaine but the defendant, very little evidence, in the course of a conspiracy, some evidence but very little, but he did clearly go to these houses and buy large quantities of marijuana and ultimately on numerous occasions clearly bought marijuana. There's an argument there that you deserve a multiple conspiracy instruction because you engage with the same people but for a different drug. And that may be then. Just accepting the argument he's making. Exactly. I mean, he is making that argument. He's saying he was involved in another drug and therefore. Right, but the drugs were charged. I mean, this is what we said. Oh, it's a non-charged drug. Yeah, something like that where there may be some evidence of the cocaine but really largely a non-charged drug was dealt from the same house by the same people to a particular defendant who now wants the multiple conspiracy instruction. Maybe then you're in a position to give him. That's not this case. This case is not that. If it was not charged, what would be his liability at all? Well, that's right. I mean, I can't say there's no danger. There may be. I mean, it may be. I guess I've seen the multiple conspiracy charge given when you have a difference in time. You know, somebody does it the first two years and then they're off in prison and so they can't be certainly engaging in the next five years. That could be, and maybe there's a fault of proof in the end as to when the purchase for the first part finished as opposed to when the charging document actually came down in the time period for the charging document. But, again, that's not the case here. And then ultimately in terms of a constructive amendment, obviously the court knows it's well-settled law that a constructive amendment really changes the elements of the offense. That wasn't done here. He was charged as cocaine and crack cocaine. It's clear that he was convicted of both, but ultimately even if he was convicted of one of the two, you can charge in the conjunctive and prove in the disjunctive, and ultimately I think Judge Williams gave the correct instruction and this was a verdict that should stand. So any questions? Thanks very much. Thank you. Mr. Martin, do you have a follow-up? Briefly, Your Honor. I want to start with this business about Chris Rainey saying that Mr. Eccleston sat around while other people came in and bought crack. Again, mere knowledge, presence, and acquiescence doesn't put him in a conspiracy. That instruction was actually given in the conspiracy instruction that Judge Williams gave. So I don't know why now the government is saying, after agreeing to that instruction, that somehow his presence puts him into the conspiracy. Also with respect to Rainey, Rainey says that Mr. Eccleston was involved in crack. I don't recall that. With all due respect to government counsel, that may have happened. Maybe I was asleep, but Mr. Eccleston certainly wasn't asleep and he would have hit me. I don't remember that. I don't think there's been any showing of active participation regarding crack in Mr. Eccleston. And I think, Your Honor, Judge Gregory has hit upon a good point. If this particular fact pattern, this scenario, doesn't amount to multiple conspiracy, then I don't think we should ask for the instruction anymore. There's just not a scenario that I can think of that fits it. And I don't say that lightly. I haven't been practicing that long, but this is one case that I thought definitely demanded that the issue be raised. There was also something about Mr. Martin saying, I don't think that there's anything wrong with the warrant. Your Honor, I had about 15 minutes, the judge took a recess, and he said, let's take a break, Mr. Martin, why don't you go to the library and do some research and come back and let me know what your objections are. That was the time I had. I had no time to discuss it with Mr. Eccleston because he was taken back to the lockup. I went straight to the library. Government came back, as I said before, mentioned Murphy. I said that Murphy had been tempered by an earlier case, and in any event, I distinguished Murphy. That was the extent. Looking back on it now, perhaps if I had had more time, like a month or two before the motions hearing, I might very well have come up with something that would have suppressed the evidence that came out of that cell phone. And what came out of that cell phone? Remember, I was arguing that Xavier Eccleston, his name's Bennett, he ain't in it. That was how I went through closing argument.  because it was a photo. It was a photo of Mr. Eccleston, not just with Phil Whitehurst, but they were at a nightclub, a social gathering, and he had all of these guys, I guess it would have filled the front of this bench, behind Mr. Eccleston. He was the only white guy. He was kneeling in front of all these other guys. I don't know what was going on with that, but that was quite damaging because what it did was it undercut, it substantially impacted on the defense. It undercut this idea that Xavier Eccleston is not part of this crew, and that came out of this cell phone fishing expedition, and the idea that you could violate the Fourth Amendment and then go to a confessional and have somebody sprinkle holy water on it later on and say it's okay, it's a harmless error. I don't know that a constitutional violation of that magnitude should be described as a harmless error. And again, with all due respect to counsel, I think that that's unfair to just minimize it that way. There was also an argument here about the fugitive indictees and the complexity of the case. Again, I haven't been a lawyer that long. It's only been 33 years. I've done a few of these cases now, and this case was no different from any other drug distribution case that I had seen come out of the office in Greenbelt. Your Honor, there was nothing complex about it. There were 10,000 contacts. 60, 60, 6-0 involved Xavier Eccleston. I was able to do an OCR search because the documents were all searchable, and I was able to hit on each one of those contacts involving Xavier Eccleston. It didn't take long to go through that, and it wouldn't have taken the government long with its DEA agents and its FBI agents. You know, they put on a show when they have the trial. They wheel in the boxes, and everybody is sitting behind them. They had plenty of people who looked through it, and as already has been pointed out, they had two years to investigate this. Mr. Eccleston demanded a speedy trial right. He was livid with me. He was so livid that I had agreed to an extension, and he actually wrote a letter to the judge firing me. I don't want Mr. Martin to represent me anymore. He's not zealous enough. He's not protecting my interests or my rights. He didn't write one letter. He wrote two letters, and I didn't file one motion. I filed two motions, and at the initial appearance and his arraignment, I also had asked that his speedy trial rights be noted on the record. So when we talk about speedy trial, I think Mr. Eccleston preserved his right. I think he suffered substantial harm, and I think the government in its late finding of this photo proves that if the trial had gone forward when it was scheduled to go forward on January 3rd, the jurors might have never seen that photo, and our defense may very well not have been undermined. That's speculation and conjecture. I'm sure if Mr. Salem could get up again, that's what he would say, but I think that's a reasonable assumption given the facts of this case, and I want to thank you for listening and giving me the time on behalf of Mr. Eccleston. Mr. Martin, I understand that you're court-appointed, and we very much appreciate your efforts for your client. You've done a fine job. That's kind of you to say so. Thank you very much. We will come down and greet the lawyers and then go directly to the next case.
judges: Diana Gribbon Motz, Roger L. Gregory, Mary G. Lewis